UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

ROXANNE FORD,                       :

                Plaintiff,          :     **OPINION**

    - against -                     :     06 Civ. 8254 (DC)

NEW YORK CITY DEPARTMENT OF HEALTH :
AND MENTAL HYGIENE,
                                    :
                Defendant.
                                    :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/23/08

**APPEARANCES:**    ROXANNE FORD
                    Pro Se Plaintiff
                    8 West 108th Street, Apt. 43
                    New York, New York   10025

                    MICHAEL A. CARDOZO, ESQ.
                    Corporation Counsel of the City of New York
                    Attorney for Defendant
                        By:  Andrez Carberry, Esq.
                    100 Church Street
                    New York, New York   10007

**CHIN, District Judge**

          In this employment case, pro se plaintiff Roxanne Ford
alleges that her former employer, New York City Department of
Health and Mental Hygiene ("DHMH"), discriminated against her
because of her gender, race, religion, and perceived disability,
sexually harassed her, and retaliated against her for complaining
of discrimination to the U.S. Equal Employment Opportunity
Commission (the "EEOC"). DHMH moves for summary judgment
dismissing the amended complaint. For the reasons that follow,
the motion is granted.

**A.    Facts**

For purposes of this motion, the facts are drawn from the parties' exhibits and Ford's own deposition.  The facts are construed in the light most favorable to Ford, as the party opposing summary judgment.

Roxanne Ford is an African-American, non-Hispanic woman who has a religious belief in God.  (Carberry Decl. Ex. A at 3).  She is not a lesbian.  (Id.).

Ford began working for DHMH on March 23, 2003 as a temporary employee.  (Id. Ex. B at 31; id. Ex. M).[1]  On November 21, 2005, Ford was hired by DHMH with the title Provisional Office Machine Aide at the urging of Vern Bethea, one of her supervisors.  (Id. Ex. B at 31; id. Ex. N at RF0042).  Her responsibilities included routine work on office equipment, picking up and distributing the mail, preparing bulk mailings, data entry, and other office duties.  (Id. Ex. C).

Starting as early as August 2005, Ford began having problems with her coworkers.[2]  In August 2005, several fellow

---

[1]  Ford claims that the questions and answers in the deposition transcript found at Exhibit B of defendant's declaration are a "forgery," and asks me to strike them as inadmissible.  I reject this request because, first, Ford was afforded an opportunity to correct the transcript, which she declined to do, and, second, the court reporter transcribing Ford's deposition swore to the accuracy of the transcript.  (See Carberry Reply Decl. at 1-2, Ex. R).

[2]  Plaintiff's 36-page statement/memorandum of law -- which is not notarized and is entitled "Amended Complaint" -- found at Exhibit 4 to her affirmation, is at times difficult to understand.  The overarching theme of the statement is that her coworkers conspired to have her employment terminated.

temporary workers began intentionally hitting the back of her chair. (Ford Aff. Ex. A ¶ 13).[3] Dana Patrick, a temporary employee, never hit Ford's chair but attempted to make Ford flinch and move up her chair to avoid being bumped. (Carberry Decl. Ex. B at 89). In August 2005, Ford asked for her desk to be reconfigured to stop people from bumping into her chair. (Ford Aff. Ex. A ¶ 4). Ford reported the bumping problem to Bethea sometime in August 2005, but her coworkers "paid him no mind" after he told them to stop. (Carberry Decl. Ex. B at 89, 90). The chair bumping continued though 2006. (Id. Ex. B at 90).

Between January and April 2006, Ford was subjected to daily insults from Patrick, Rosa Hernandez, and Huali Sun, who were all temporary employees of DHMH. (Id. Ex. B at 46-49).

Ford testified at her deposition about the nature and frequency of coworkers' comments, and how she perceived the comments as relating to her race:

> Q: What leads you to believe you were discriminated against because of your race?
>
> A: Because Ms. Patrick and several other employees, well, Ms. Patrick the main one was saying that I was Spanish.

---

[3] Ford did not submit any notarized sworn statements to the Court. She also failed to controvert each paragraph in defendant's 56.1 statement with admissible evidence. Nonetheless, I use the facts set forth in Exhibit A to Ford's Affirmation, which is an attachment previously included with her first amended complaint, as well as Exhibit 4 to her Affirmation, which is entitled "Amended Complaint" but appears to directly respond to defendant's briefing papers, as these two documents express the facts most favorable to the non-moving plaintiff.

Q:   Okay.

A:   I do not speak Spanish.

Q:   She said you were Spanish?

A:   Correct.

Q:   When did that happen?

A:   It happened several days a week, January, February, March, several times a day Monday to Friday.

...

Q:   Anything else, anybody else, anything else or was that mainly Ms. Patrick?

A:   Ms. Patrick.

Q:   Is there anything else that led you to believe you were discriminated against because of your race?

A:   Just she kept saying I was Spanish.

Q:   So that was it?

A:   According to my race.

...

Q:   Is there anything else?

A:   That she said about me?

Q:   Anyone else or anything else, you're saying --

A:   About race?

Q:   Yes, about race.

A:   No, just Ms. Patrick.

Q:   So everything you've just told us is the reason you believe you were discriminated against because of your race?

A:   Yes.

(Id. Ex. B at 45-47).

Ford also testified about the extent to which her coworkers made comments she perceived to be based on her gender:

Q:   What led you to believe you were discriminated against because of your gender?

A:   Because some of the employees called me a man.

Q:   Who?

A:   Ms. Patrick, Ms. Sun, Hernandez, Ms. Hernandez.

Q:   So Ms. Sun and Ms. Patrick, correct?

A:   Correct.

Q:   Could you tell me when they did this. Let's start with Ms. Patrick.  When did she call you a man?

A:   It was more than saying Spanish.  That was that whole time, January, Monday to Friday, nine to five, several times a day.

Q:   So every day Ms. Patrick from the time you were employed at Department of Health and Mental Hygiene every day from January through April Ms. Patrick would call you a man?

...

A:   Correct.

Q:   Every day?

A:   Every day.

...

Q:   How about Ms. Sun; you said that Ms. Sun also discriminated against you because of your gender?

A:   Yes.

...

Q:    And what leads you to believe that Ms.
      Sun discriminated against you because of
      your gender?

A:    She was saying the same thing.

Q:    Which was?

A:    I'm a man.

Q:    That you're a man?

A:    Right.

Q:    How often did this occur?

A:    Well, not at the same time but it was
      Monday to Friday from January to April
      2006.

Q:    Every day?

A:    It was every day.

...

Q:    What led you to believe that you were
      discriminated against because of your
      gender by Ms. Rosa Hernandez?  What did
      she do that leads you to believe you
      were discriminated against because of
      your gender?  You're looking at the
      complaint to refresh your recollection?

A:    Correct.  She called me other names.

Q:    What did she call you?

A:    Fat fish, super fish, dumb fish.  She
      also hit me.  She also hit the chair
      real hard and I was sitting in the
      chair.

Q:    When did she call you fat fish?

A:    Several times a day from January to
      April 2006.

Q:    And when did she call you a dumb fish?

A:    The same.

Q:    So it was alternating between fat fish,
      dumb fish?

A:    Alternating.

...

Q:    Is there anything else that led you to
      believe you were discriminated against
      because of your gender?

...

A:    They would say, well, Patrick would say
      something where's the penis like it was
      sticking up for some reason and they
      would stand in front of me and look at
      the private area, then she would turn,
      go to her desk and say that's a woman.

Q:    When did this happen?

A:    It didn't happen every day.

...

Q:    But that's when it first started?  How
      often did that happen?

A:    When she was there, whatever day she was
      there.

...

Q:    [A]nything else out of what you just
      told us?

A:    That they was looking at me.

Q:    Who was looking at you?

A:    Patrick, Hernandez and Ms. Sun.

Q:    Look at you?

A:    Correct.  First they would say I'm a man
      and then later on for whatever reason
      they would say I'm a female but I was
      not flashing them and I was just going
      to my desk and trying to do my work.

Q:    And so they would look at you.  How
      often would they do that?

A:    When they're there.  I really wasn't
      paying any mind.  Sometimes I could
      glance and see that they're staring at
      me.

...

```
Q:   Is there anything else that led you to
     believe you were discriminated against
     because of your gender?

A:   I always wore pants.

Q:   You always wore pants?  That wouldn't be
     anybody else discriminating against you,
     would it?

A:   They assumed that I'm a man.  Never wore
     a skirt.  If they ask anybody else
     anything about me did you ever see her
     in a skirt so how would you know she's a
     woman.

Q:   Is there anything else?

A:   No.
```

(Id. Ex. B at 48-52, 54, 56-57).

In sum, Ford testified at her deposition that several times a day, every day, for the months of January, February, March, and April she was subjected to derogatory comments by temporary employees based on her race and gender.  Ford, however, did not report any of these incidents to Bethea or Giselle Merizalde, another of Ford's supervisors.  (Id. Ex. B at 50, 51).

Starting on November 21, 2005, Bethea and Merizalde started to "act differently" toward Ford.  (Ford Aff. Ex. A ¶ 1). In January 2006, Bethea suddenly turned to Ford in the office, looked at her, called her a "stupid fish," and said "why did you let me give you the wrong job."  (Id. Ex. A ¶ 2).  Ford did not report the incident to anyone.  (Id. Ex. A ¶ 2).  In February 2006, Bethea saw Ford at a coffee shop, looked at her and said, "you are the faggot."  Bethea then looked startled and said, "I'm

sorry." Ford did not say anything in response. (Id. Ex. A ¶ 3).
At some point during Ford's tenure with DHMH, Bethea said to her
"I got that fat fish fired for no reason." (Id. Ex. A at 5).[4]

On March 6, 2006, Ford was involved in a physical
altercation with Dana Patrick. (Carberry Decl. Ex. D). Ford's
account of the incident is that Patrick hit her on the foot with
a heavy vacuum cleaner, and that in response Ford held up her
hand to protect herself and touched Patrick's hand. (Id. Ex. B
at 54-55). Ford "did not curse at Ms. Patrick [she] was shocked
and said what the fuck are you doing behind her." (Ford Aff. Ex.
4 at 2; id. Ex. A ¶ 8).

Bethea and Merizalde conducted an investigation of the
incident and interviewed witnesses, including Rosa Hernandez.
(Carberry Decl. Ex. J at RF0152). Hernandez submitted a signed
statement to Merizalde dated March 6, 2006, which explained that
she witnessed Patrick accidentally hit Ford with the vacuum, that
Patrick was oblivious to what happened, and that Ford pushed
Patrick's hand and told her to watch where she was going. (Id.
Ex. E). Hernandez also stated that Patrick "was startled by the
situation and apologized for the accident." (Id. Ex. E).

Patrick submitted a signed statement to Bethea
regarding the incident on March 6, 2006. (Id. Ex. D). In the
statement, Patrick claimed she was cleaning up the shredding and

---

[4] None of these incidents were corroborated or reported and
Bethea denies they occurred. (Carberry Aff. Ex. N at RF0042).
Merizalde and Bethea assert that Ford never complained of abuse
or discriminatory comments and that she "sometimes made
irrational accusations," including telling Merizalde that a
coworker was "trying to take my husband away." (Id. Ex. N at
RF0042).

vacuuming, and that while she was trying to put the bag on the vacuum it slipped out of her hand and accidentally bumped Ford's foot. (Id. Ex. D). She alleged that Ford responded by hitting her on the hand with a paper bag and cursing. (Id. Ex. D).

Later in the day on March 6, following his investigation, Bethea met with Ford and informed her that her conduct was inappropriate and admonished her for physically assaulting Patrick and using profanity. (Id. Ex. B. at 68, 109; id. Ex. J at RF0152). Merizalde witnessed this counseling session. (Id. Ex. J at RF0152). Bethea told Ford "to quail her physical assault on her colleagues and if this adverse behavior continued that her services would be terminated." (Id. Ex. J at RF0152). Bethea also instructed Ford to seek her supervisor's help in the event that a situation similar to that one occurred again. (Id. Ex. J at RF0152). At this meeting, Ford complained about the vacuum hitting her and denied hitting Patrick, but did not tell Bethea about the comments Patrick and others had been making. (Id. Ex. B at 54). Ford did not submit a written statement regarding the incident. (Id. Ex. J at RF0152). At her deposition, Ford testified about her understanding of the warning she received from her supervisors:

> Q: So you were advised in the March meeting not to do it again or you'd be terminated, correct, not to hit other employees and to adjust the behavior problems otherwise you would be terminated, is that what you're saying happened?
>
> A: Correct.

(Id. Ex. B at 68).

Following the March 6 altercation, Bethea directed Ford to attend a counseling session with Dr. Michael Gehl, Medical Director of DHMH's Employee Assistance Program. (Id. Ex. B at 65-66). He made the appointment for her because he was troubled by his observations of her and felt that "her behavior was episodic and irrational." (Id. Ex. J at RF0152). Bethea told Ford that she was required to attend the session or she would be discharged. (Ford Aff. at 3).

At the appointment, Gehl told Ford that she was in an intimidating work environment. (Carberry Decl. Ex. B at 125). Gehl gave Ford a note indicating she was fit to work, which Ford gave to Merizalde. (Id. Ex. B at 125). Following the meeting, Gehl advised Bethea to contact Rose Tessler of the Employment Law Unit for help obtaining some professional counseling for Ford. (Id. Ex. J at RF0152). Tessler and Bethea agreed that they would meet in late April to discuss how to best get Ford into a mental health treatment program. (Id. Ex. J at RF0152).

On April 26, 2006, before a counseling session could be scheduled, Ford was involved in a physical altercation with Huali Sun. (Id. Ex. F). Sun submitted a statement to Bethea detailing what happened. (Id. Ex. F). Her statement indicated that she was cleaning the shredding machine, when a broomstick slid back to the right of her and apparently touched Ford, but that she was unaware that the broomstick had made contact with Ford. (Id. Ex. F). Sun believed that the broomstick merely touched Ford, but did not hurt her. (Id. Ex. F). Sun further stated that she said

she was sorry to Ford but that Ford hit her with her left backhand on the right side of Sun's belly, causing Sun pain. (Id. Ex. F).

Barry Frances, who witnessed at least part of the incident, submitted an "Incident Report" to Bethea. (Id. Ex. J at RF0157). His report indicated that Ford and Sun argued about who hit whom, and that Sun stated that Ford hit her, but did not indicate that he witnessed the actual assault. (Id. Ex. J at RF0157). Following the incident, Sun flipped though a copy of the Standard of Conduct handbook in front of Ford, and said "I hope you get your job back." (Ford Aff. Ex. 4 at 4).

Bethea met with Ford following the incident and Ford denied anything had happened. (Carberry Decl. Ex. J at RF0153). Ford later stated that she only lightly touched the right side of Sun's abdomen after Sun hit her with a dustpan handle. (Ford Aff. Ex. A ¶ 11).

Ultimately, Bethea felt that because of Ford's "demeanor and physical assault it caused total chaos in the work area" and he relocated Sun to another area "for safety reasons." (Carberry Decl. Ex. J at RF0153). Bethea advised Ford she would be discharged effective April 28, 2006, because of her altercations with Patrick and Sun, as her conduct was unbecoming of an employee. (Id. Ex. B at 110; id. Ex. G). Bethea consulted with Tessler and Robert Bohack, from DHMH's Human Resources Department, who both agreed that discharging her was appropriate. (Id. Ex. J at RF0153). Bethea gave Ford a letter notifying her that her employment termination would be effective April 28, 2006. (Id. Ex. G).

Ford testified at her deposition that her supervisors' reaction to the physical altercations demonstrated that they perceived her to have a disability:

> Q: And what led you to believe you were being discriminated against because of a perceived disability?
>
> A: Because of the incidents that happened on the job assuming that I hit someone and it was, assuming that it was paranoia and behavior problems.
>
> Q: Who assumed this?
>
> A: Mr. Bethea.
>
> Q: And how do you know that he made that assumption?
>
> ...
>
> A: Because he told me.
>
> Q: What did he say to you?
>
> A: And Giselle Merizalde also.
>
> Q: First let's start with Mr. Bethea. What did he say to you and when did he say that?
>
> A: When did he say it?
>
> Q: Yes.
>
> A: First incident was in March 2006.
>
> Q: In your meeting with him he said what?
>
> A: He said Roxanne, I am shocked that you hit Patrick, this is all of a sudden, this is a surprise to him and that assumed that I had something wrong with me because I told him there is nothing wrong and I told him I was telling the truth and I don't have paranoia so that's why he wanted me to go to the psychiatrist.
>
> Q: So they arranged a psych evaluation for you, is that what happened?

>           A:    A psychiatric evaluation?  Yes.  He said
>                 he wanted to find out why.

(Id. Ex. B at 64-65).

Ford also testified that she does not suffer from an actual disability and has never been diagnosed with paranoia. (Id. Ex. B at 66, 72).

On April 27, 2006, Ford was interviewed by Howard Bailey, an Associate Investigator at the DHMH Office of Equal Employment.  (Id. Ex. H).  The following day she filed a complaint of discrimination with the office, alleging (1) she was the object of discrimination based on age and religion, (2) she was sexually harassed, and (3) she was retaliated against for filing/assisting in the investigation of her complaint.[5]  (Id. Ex. I).  The report detailed the factual basis for Ford's claims:

>           Judy Adama was a temporary worker, she came
>           to work after I did.  She started to look at
>           me weird, she stared to say things like fat
>           bitch, she several times stare at me, one day
>           she said look said it twice I didn't look
>           because I was trying to do my work and I
>           don't know what she was going to saw me.  She
>           said I'm not the real Roxanne Ford and that I
>           am a man and my social security is not real.
>           I stole it from some one and she said I know
>           the real one.  I didn't say anything because
>           I know she wasn't talking to me.  I don't
>           know her at.  And she tried to tell me that
>           she came to work here on 04-23-2003.  And not
>           to say anything about it.  And to leave the
>           job this happen in room 222.  Then I moved to
>           room 225.  She moved also and was doing the
>           same thing.  One day she said I don't even

---

[5]  Ford claims that when she went to Bailey's office on April 28, he told her "to get the fuck out of my office with that piece of paper," and "said something like [she] was trying to bribe him."  (Ford Aff. Ex. 4 at 14).  This claim is not corroborated and is mentioned only a single time in Ford's papers.

> have to be near you to kill you.  She throws
> up her hand and I felt sprinkle of little
> dust in the air.  She kept say your feet
> stink, your pussy smell like fish.  When she
> moved from room 225 one day she came by to
> talk to a worker, as she was leaving she kick
> the bottom of my chair.

(Id. Ex. I at RF0147 (typographical errors in original)).

In her complaint to Bailey, Ford alleged that Bethea and Merizalde improperly forced her to go to the psychiatrist under threat that her employment would be terminated if she did not attend.  (Id. Ex. I at RF0145).  She also complained that she was informed by Bethea that five people had filed complaints against her, but that she rarely saw those people who complained. (Id. Ex. I at RF0145).  Ford filed the complaint because she believed that doing so would prevent her discharge.  (See id. Ex. B at 116).

Ford also contacted a representative of her union to inform them that she was being illegally fired:

> . . . I said I'm being terminated for
> incidents unbecoming an employee and the
> reason why I said they're lying on me saying
> that I hit them and it was other problems on
> the job but actually I said that I hit
> employees on the job and then she went and
> said nobody should hit anyone, we're grown
> people, let me talk to your supervisor and
> when she did I was told not by her and
> Giselle Merizalde told me later that, she
> told her.

(Id. Ex. B at 73).

On May 1, 2006, Ford filed a police report regarding an "assault" that occurred at DHMH on October 3, 2005 and April 26, 2006.  (Ford Aff. Ex. V).  The report contained no details of the alleged assaults.  (Id. Ex. V).  That same day, the New York City

Department of Investigations referred a complaint received from Ford to Judy Freeman, Executive Assistant of the Office of the Commissioner of DHMH. (Carberry Decl. Ex. K at RF0036).

On May 2, 2006, Bethea submitted a memorandum to Bailey detailing the events leading to Ford's employment termination. (Id. Ex. J). On May 19, 2006, Ford was advised by letter from Harold Bailey that the allegations in her complaint were not substantiated. (Id. Ex. L). On July 3, 2006, Bailey submitted his investigative report to Dorothy Wright, the Equal Employment Opportunity Director of DHMH. (Id. Ex. N at RF0052). The investigative report noted that on April 28, 2006, Bailey interviewed Dr. Gehl via phone regarding Ford. (Id. Ex. N at RF0055). The report stated that Gehl confirmed Bethea's account of the events leading to Ford's firing, and that Gehl did not believe Ford could hold down any job at all, as Ford seemed to think everyone was out to get her. (Id. Ex. N at RF0055). Gehl also stated he told Ford to go to the Equal Employment Opportunity Office because he did not know where else to send her. (Id. Ex. N at RF0055).

On June 30, 2006, Ford filed a charge of employment discrimination against DHMH with the EEOC, alleging that she was unlawfully discharged and discriminated against because of her religion, sex, and perceived disability. (Id. Ex. M). In the "particulars" portion of her discrimination charge, Ford wrote:

> Dana Patrick harassed me because of my gender beginning in January and did so regularly through April, 2006. She made comments such as "fat fish", "you're a man", "faggot", and "dyke". One day she was standing in front of

me looking at me and said "oh, you are a woman".  She also made comments based on my religion.  At times I would say "Jesus" or "God" in my mind, and Ms. Patrick would comment back "Jesus can't help you".  She also harassed me by attempting to hit my chair when she would walk by, and one day she hit me with a vacuum cleaner.  Other employees who harassed me include, Alaina Stoute and Barry Francis.

Verne Bethea discriminated against me on account of a perceived disability.  He thought that I had behavioral problems or paranoia and forced me to see a psychiatrist otherwise I would lose my job.  I went to the psychiatrist, Dr. Gehl, in April.

They retaliated against me by terminating me in violation of their own policy on termination.  I have complained to their EEO office and have contacted the Inspector General's office, but nothing was done.

It is for these reasons that I feel that I was discriminated against on account of my sex, religion, and disability and was retaliated against.

(Id. Ex. M).

On August 14, 2006, DHMH answered the discrimination charge, denying all allegations.  (Id. Ex. N).  The reasons set forth by DHMH for Ford's firing were "physical altercations" and "the necessity of avoiding further disruption of the office." (Id. Ex. N at RF0043).  DHMH claimed that Ford shared a small office space and was overly sensitive when it came to perceived invasions of her personal space.  (Id. Ex. N at RF0042).  DHMH further claimed that Ford never complained to her supervisors of any harassment and was not discharged after the first assault, although this was an option given Ford's provisional employment status.  (Id. Ex. N at RF0042).

On August 18, 2006, the EEOC issued its decision, concluding that the evidence failed to indicate that DHMH had violated any anti-discrimination laws. (Id. Ex. O). On August 21, 2006, the EEOC mailed Ford a Dismissal and Notice of Rights. (Id. Ex. P).

## B.  **Procedural History**

On October 10, 2006, Ford filed her complaint against DHMH, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified at 42 U.S.C. §§ 2000e to 2000e-17, and the Age Discrimination in Employment Act of 1967 ("ADEA"), as codified at 29 U.S.C. §§ 621-634. On January 12, 2007, Ford filed an amended complaint, adding an allegation of a violation of the Americans with Disabilities Act of 1990 ("ADA"), as codified at 42 U.S.C. §§ 12112-12117, and dropping her ADEA claim.

Ford asserts claims of discriminatory termination, unequal terms and conditions of employment, retaliation, and sexual harassment between January 2006 and April 2006. Among Ford's allegations are that (1) she was forced to see a psychiatrist or else lose her job; (2) her coworkers verbally abused her by saying things like she was "a man," "Spanish," and "a fat fish"; and (3) she was unfairly blamed for physical altercations with coworkers.[6]

---

[6]  She also alleges that employees complained to Ford's supervisors about her but she was not told who was complaining or the substance of the complaints and the department hired another employee with the same job title using her social security number while they still owed her leave. As there is no feasible legal basis of recovery for these claims articulated in the complaint, I do not address them.

DHMH answered the amended complaint on March 19, 2007. DHMH was served with a second amended complaint on March 20, 2007.  On April 27, 2007 a pretrial conference was held in the case, and I notified Ford that the Court did not authorize her to file a second amended complaint and if she wanted to file one she needed to make a motion.  She did not make such a motion.

DHMH filed its motion for summary judgment on December 10, 2007.  Ford opposed the motion on December 27, 2007 and DHMH replied on January 22, 2008.

## DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

A court must be "especially cautious" in deciding a motion for summary judgment in a discrimination case because "the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination."  Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).

**B.    Disparate Treatment and Wrongful Termination**

Title VII protects individuals from discriminatory employment practices because of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1)-(2).  The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent.  Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 119 (2d Cir. 1997); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework for federal discrimination claims set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and a plaintiff in an employment discrimination case usually relies on the three-step McDonnell Douglas test.  First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  See id. at 802 & n.13 (noting that elements of prima facie case vary depending on factual circumstances); Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006); Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

If the plaintiff establishes a <u>prima facie</u> case of unlawful discrimination, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." <u>Stratton v. Dep't for the Aging</u>, 132 F.3d 869, 879 (2d Cir. 1997); <u>see</u> <u>Reeves</u>, 530 U.S. at 142-43. If the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993); <u>see</u> <u>James v. N.Y. Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000).

The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. <u>See</u> <u>Fields</u>, 115 F.3d at 120-21; <u>Connell v. Consol. Edison Co.</u>, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000). It is not sufficient for a plaintiff merely to show that she satisfies "<u>McDonnell Douglas</u>'s minimal requirements of a <u>prima facie</u> case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." <u>James</u>, 233 F.3d at 153. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. <u>See</u> <u>id.</u> at 154; <u>Connell</u>, 109 F. Supp. 2d at 207-08.

1. **Gender Discrimination**

With respect to her disparate treatment and wrongful termination claims, Ford alleges that (1) her coworkers called her derogatory names like "stupid fish," "fat fish," "dyke," and "faggot," (2) on at least one occasion, Patrick stated Ford had a penis and then changed her mind and said Ford was a woman, (3) her coworkers called her a man, (4) her coworkers would look at her, and (5) she always wore pants. These circumstances, Ford argues, demonstrate that she was discriminated against based on her gender.

It is undisputed that Ford establishes the first three elements of her prima facie case. Defendant concedes that Ford is a woman, and therefore a member of a protected class, and that -- apart from the physical altercations with her coworkers -- she performed her job satisfactorily. It is also undisputed that Ford's discharge was an adverse employment action. See Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (an adverse employment action is a "materially adverse change in the terms and conditions of employment," such as termination of employment (internal quotation omitted)).

Ford has failed, however, to show that the circumstances she alleges give rise to an inference of gender discrimination for five reasons:

First, Ford provides no evidence that her coworkers' looks and abusive comments -- like "fat fish" and "stupid fish" -- were directed at her because she is a woman. The comments,

which were certainly disrespectful and rude, indicate her coworkers' general dislike for Ford, but are not objectively indicative of gender animus.  See Fridia v. Henderson, No. 99 Civ. 10749 (BSJ), 2000 WL 1772779, at *6 (S.D.N.Y. Nov. 30, 2000) ("not every unpleasant matter creates a cause of action").

Second, comments such as "dyke," "faggot," and, arguably, "you're a man" all indicate bias based on Ford's perceived sexual orientation and not her gender.  Discrimination based on sexual orientation is not prohibited under Title VII. See, e.g., Simonton v. Runyon, 232 F.3d 33, 35 (2d Cir. 2000) ("The law is well-settled in this circuit and in all others to have reached the question that . . . Title VII does not prohibit harassment or discrimination because of sexual orientation."). With respect to Bethea's alleged comment that Ford was a "faggot," this would also be based on Ford's perceived sexual orientation and not her gender.  Even if Bethea's comment was gender-based, at her deposition Ford testified that Bethea fired her because he believed her coworkers' accounts of the two altercations and not because of gender animus:

> Q:  When [Bethea] terminated you in April 2006 did he terminate you, did he say he was terminating you because you were a faggot?
>
> A:  No.
>
> Q:  Do you believe when he terminated you in April 2006 he did so because he believed you were a faggot?
>
> A:  No.

(Carberry Decl. Ex. B at 80).

Third, the verbal abuse came from temporary workers who were presumably Ford's subordinates, and were therefore in no position to affect the terms and conditions of her employment by firing her. Additionally, Ford concedes that she never reported any of her coworkers' comments to her supervisors, so it would have been factually impossible for Bethea and Merizalde to have acted with gender animus based on those comments.

Fourth, it is unlikely that Ford's employment termination was due to gender discrimination because Bethea was the same individual who hired her. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) ("[W]here the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire."); Cooper v. Morgenthau, No. 99 Civ. 11946 (WHP), 2001 WL 868003, at *6 (S.D.N.Y. July 31, 2001) ("[I]t is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." (internal quotations omitted)).

Fifth, almost all of the individuals alleged to have engaged in discriminatory activity, including Merizalde -- who was directly involved in the decision to fire her -- are women. This provides support for the argument that they were simply taunting Ford because they disliked her and not because of impermissible gender animus. See Zuffante v. Elderplan, Inc., No. 02 Civ. 3250 (WHP), 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004) (noting that discrimination is unlikely when the individual

charged with discrimination "is in the same protected class as plaintiff").

Because Ford has not submitted evidence that gives rise to an inference of gender discrimination, she has failed to establish her <u>prima</u> <u>facie</u> case.  Even if Ford had established a <u>prima</u> <u>facie</u> case and the burden of rebuttal shifted to defendant, DHMH has articulated a legitimate, nondiscriminatory reason for firing Ford  -- that Ford physically assaulted two coworkers. While Ford alleges that she did nothing wrong, her story is uncorroborated, and both assaults were investigated by her supervisors who concluded she was at fault.  Furthermore, Ford admits that she was put on notice after her altercation with Patrick that if she was involved in any more altercations she would be fired.  Even taking Ford's version of events as true, she admits to touching Sun after this warning, offering support to DHMH's position that her employment termination was justified.

Ultimately, no reasonable jury could conclude that Ford's dismissal was motivated in any way by her gender.

### 2.   **Religious Discrimination**

Ford bases her entire religious discrimination claim on the fact that Patrick somehow perceived, on one occasion, that Ford was asking God or Jesus for help in her own head, and in response said "Jesus can't save you."  Ford's claim that she was discriminated against because of her religion must fail, as no reasonable jury could conclude either that Patrick could read Ford's mind or, even if she could, that this comment gives rise to an inference of religious discrimination.

Ford has simply not articulated a sufficient factual basis for the claim. First, the comment was made only a single time, by one coworker who was not in a position to fire Ford, and was never reported to Ford's supervisors. At the very worst, Patrick's comment was a stray remark, which would not constitute evidence of discrimination. See Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."); Silver v. N. Shore Univ. Hosp., 490 F. Supp. 2d 354, 362-63 (S.D.N.Y. 2007).

Second, as previously discussed, Bethea would not likely have developed religious animus toward Ford during the months between her hiring and firing.

Third, it is not clear that Patrick's comment indicates any animus based on Ford's religious beliefs. The fact that Ford was annoyed by the comment simply does not make it actionable. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

The fourth and most compelling reason for concluding that Ford's religious discrimination claim fails as a matter of law is that Ford does not allege and provides no evidence that her employment termination occurred as a result of religious animus.

Even if Ford had established a prima facie case and the burden of rebuttal shifted to defendant, DHMH has articulated a legitimate, nondiscriminatory reason for firing Ford. Accordingly, her religious discrimination claim is dismissed.

### 3.   **Racial Discrimination**

####    a.   **Exhaustion of Administrative Remedies**

Plaintiffs bringing Title VII employment discrimination claims must first file a timely charge with the EEOC or a state or local agency with the authority to grant relief from such a practice.  42 U.S.C. § 2000e-5(e); Francis v. City of N.Y., 235 F.3d 763, 768 (2d Cir. 2000) (exhaustion of administrative remedies is a precondition to suit).  Generally, plaintiffs may only raise claims in the district court that were included in the EEOC charge.  One exception to this rule is if the charges brought in district court are "reasonably related to" the allegations contained in the EEOC charge.  Stewart v. U.S. I.N.S., 762 F.2d 193, 198 (2d Cir. 1985).

A claim is "reasonably related to" the allegations in the EEOC charge where the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Smith v. Am. President Lines, Ltd., 571 F.2d 102, 107 n.10 (2d Cir. 1978). In this inquiry, "the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'"  Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (quoting Freeman v. Oakland Unified Sch. Dist., 291 F.3d 632, 637 (9th Cir. 2002)) (alteration in original).

I dismiss Ford's racial discrimination claim because she failed to raise this claim in her June 30, 2006 EEOC charge.

This claim is not "reasonably related to" the allegations in the EEOC charge because it bears no factual relation to those allegations and would not naturally be addressed in the course of an EEOC investigation. See Benjamin v. N.Y. City Dep't of Health, 144 Fed. App'x 140, 142 (2d Cir. 2005) (employee did not exhaust administrative remedies with respect to national origin claim when the administrative complaint alleged only race discrimination and focused on her "dark skin" and not her Jamaican origin).

### b. **Alleged Discrimination**

Even if Ford had exhausted her administrative remedies with respect to her racial discrimination claim, she could not prevail on the claim because no reasonable jury could find that she established her prima facie case.

Ford argues that her coworkers called her "Spanish" when she is actually African American, and that this alone amounts to impermissible racial discrimination. It is not disputed that Ford is a member of a protected class because she is African American, that she performed her job satisfactorily, or that she suffered an adverse employment action. Rather, Ford's claim fails because she does not provide any evidence that the circumstances give rise to an inference of racial discrimination. First, calling a coworker "Spanish" does not demonstrate racial animus simply because the plaintiff is a member of a protected class. See Pearson v. Board of Educ., 499 F. Supp. 2d 575, 593 (S.D.N.Y. 2007) (rejecting plaintiffs'

racial discrimination claim where the "only evidence plaintiffs have offered in support of their claim that the conduct was based on race is that they are African American.").

Second, calling someone "Spanish" is not even objectively negative. Rather, the comment is entirely innocuous and provides no support for Ford's claim that she was discharged for an impermissible reason. As previously noted, a comment that is merely annoying to plaintiff does not meet the demands of Title VII. See Fridia, 2000 WL 1772779, at *6.

Finally, even if Ford had established a prima facie case and the burden of rebuttal shifted to defendant, DHMH has articulated a legitimate, nondiscriminatory reason for firing her. Accordingly, her racial discrimination claim is dismissed.

## C. **Hostile Work Environment Sexual Harassment**

Sexual harassment claims, which are a form of gender discrimination under Title VII, generally fall into two categories: quid pro quo claims, which involve "a threat which is carried out," and hostile environment claims, which involve "offensive conduct in general." Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998)); see also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603-04 (2d Cir. 2006). Here, Ford has not asserted a quid pro quo claim, as she has not alleged that she was subjected to any threats, nor has she claimed that she was subjected to adverse employment action because of her refusal to submit to sexual advances. Rather, she

complains that she was subjected to ongoing verbal abuse that referenced her gender.  Accordingly, I analyze the claim as a hostile environment claim.

### 1.  **Applicable Law**

A Title VII hostile work environment plaintiff must first demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (internal quotations omitted); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  This first element has both a subjective and an objective component.  The misconduct must be sufficiently severe or pervasive to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive.  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21022 (1993)).  To determine whether conduct is objectively severe or pervasive, the court must consider the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004). Conduct is not sufficiently severe or pervasive if it does not alter the conditions of employment.  As the Second Circuit has

recognized:  "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."  Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004).

Second, a plaintiff must demonstrate that the abusive conduct occurred because of plaintiff's membership in a protected class.  See Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).  Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII.  The statute prohibits discrimination, and is not a civility code.  See Oncale, 523 U.S. at 81.

Third, the plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996).

Finally, on a motion for summary judgment, the nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations."  Cadle Co. v. Newhouse, No. 01 Civ. 1777 (DC), 2002 WL 1888716, at *4 (S.D.N.Y. Aug. 16, 2002) (internal quotation omitted); see also Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) (finding "[p]urely conclusory allegations of discrimination" insufficient to defeat summary judgment motion).  "Personal speculation is insufficient as a matter of law to raise an inference of discrimination."  Boise v. N.Y. Univ., No. 03 Civ. 5862 (RWS), 2005 WL 2899853, at *4 (S.D.N.Y. Nov. 3, 2005).

## 2. **Application**

Summary judgment is granted in favor of DHMH dismissing Ford's sexual harassment claim. Ford's claim must fail for three reasons: First, Ford does not provide adequate evidence that the misconduct was sufficiently severe or pervasive. Second, Ford does not provide evidence that the conduct was directed at her because of her gender. Third, she does not present competent evidence that a specific basis exists for imputing the verbal abuse she endured to DHMH. In light of the totality of the circumstances, a reasonable jury could not find in Ford's favor on her hostile work environment claim.

### a. **Severe and Pervasive Conduct**

No reasonable jury could find that the alleged misconduct was so severe or pervasive as to be objectively hostile or abusive. First, while Ford was subjected to unkind comments on a daily basis, the comments continued for only four months. Second, the comments were not physically threatening or severe. See Lewis v. N. Gen. Hosp., 502 F. Supp. 2d 390, 403 (S.D.N.Y. 2007). Third, Ford has not indicated that the teasing interfered with her work performance. Absent her two physical altercations with coworkers, her supervisors found no fault with her work performance. The comments were not so severe that Ford was compelled to notify her supervisors. The fact that she complained to Bethea and Merizalde about the chair bumping indicates that she felt comfortable complaining to them of any treatment she found untenable. Finally, the only evidence

submitted by Ford regarding the alleged verbal abuse is her own
conclusory, unsworn statement, which is insufficient to raise a
genuine issue of fact for trial.  See  Jackson v. Citiwide
Corporate Transp., Inc., No. 02 Civ. 1323 (DC), 2004 WL 307243,
at *2 (S.D.N.Y. Feb. 17, 2004).

    In light of the totality of the circumstances, a
reasonable jury could only conclude that the alleged misconduct
was not sufficiently severe or pervasive to be actionable under
Title VII.

### b.    Abuse Due to Membership in a Protected Class

    Even assuming that Ford was subjected to objectively
severe and pervasive conduct, for Title VII to apply Ford must
show that the misconduct occurred because of her membership in a
protected class.  See Brennan, 192 F.3d at 318.  As discussed
above, she has failed to do so.  There is no evidence to support
the inference that her coworkers called her "fat fish," "a man,"
"faggot," and "dyke" because she is a woman.  Ford does not
allege that anyone made sexual advances towards her.  As
previously discussed, to the extent Ford alleges the comments
were directed at her because of her perceived sexual orientation,
the conduct is not be actionable under Title VII.

### c.    Imputation to DHMH

    Finally, Ford has failed to establish that there is any
basis whatsoever for imputing her coworkers' actions to her
employer.  Ford has admitted that the conduct was limited to only
a few individuals and that she never reported the conduct to her

supervisors.  As Bethea and Merizalde were responsible for firing her, and there is no way to impute the alleged animus to them because they were unaware of it, Ford's sexual harassment claim must be dismissed.

## D.    **Retaliation Claim**

### 1.    **Applicable Law**

Title VII prohibits an employer from firing or otherwise discriminating against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Thus, Title VII's "participation clause" protects participation in a proceeding under Title VII.  See Deravin, 335 F.3d at 203 n.6.  Further, "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'"  Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (citation omitted).   The McDonnell Douglas burden-shifting framework applies not only to disparate treatment and wrongful termination claims, but also to claims of retaliation. Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).

To establish a prima facie case of retaliation, Ford must show that (1) she was engaged in protected activity; (2) DHMH was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action.  Id.; accord Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 172-73 (2d Cir.

2005). A plaintiff may present proof of causation either "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).

## 2. Application

Ford is unable to demonstrate that there was a causal connection between the protected activity and the adverse action, and is therefore unable to establish her prima facie case. The indisputable facts show that Ford first complained to the EEOC after she was notified that she was being discharged and after she was required to attend counseling, the only adverse employment actions she alleges. Therefore, it is legally and factually impossible for DHMH to have retaliated against her. See, e.g., Zeigler v. Marriot Int'l, Inc., No. 03 Civ. 7688 (RWS), 2005 WL 1022431, at *15 (S.D.N.Y. May 2, 2005) (discipline one day after plaintiff filed discrimination charge insufficient where written warnings were issued prior to filing of charge); Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 312-13 (S.D.N.Y. 2000) (suspension two days after complaint to state authority insufficient to establish retaliation where disciplinary steps were taken before complaint); see also McLee v. Chrysler Corp., 109 F.3d 130, 136 (2d Cir. 1997) (termination three days after supervisors learned plaintiff had contacted civil rights lawyer

did not create issue of fact where plaintiff had been told earlier that he was going to be fired).

The fact that Ford was under the mistaken impression that DHMH would allow her to keep her job while they investigated her claim is legally irrelevant.  Furthermore, Ford admits she was trying to prevent the firing by initially complaining to Bailey.  (See Carberry Decl. Ex. B at 116).

As Ford has not provided competent evidence from which a reasonable jury could find that she was discharged in retaliation for filing her charge of discrimination, her retaliation claim is dismissed.

**E.    ADA Claim**

      **1.    Applicable Law**

To establish a prima facie ADA case, a plaintiff must show that "(1) plaintiff's employer is subject to the ADA; (2) plaintiff was disabled within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered [an] adverse employment action because of her disability." Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004).  A plaintiff may be considered "disabled" under the ADA if she is "regarded as" suffering from a physical or mental impairment that "substantially limits one or more of the major life activities," even if she does not actually suffer from such an impairment.  42 U.S.C. § 12102(2)(A) & (C).

## 2.  **Application**

Ford admits that she does not suffer from an actual disability and has never been diagnosed with paranoia.  Rather, Ford alleges only that Bethea and Merizalde unfairly <u>perceived</u> her as paranoid and having behavioral problems under the "regarded as" prong of the ADA, and that in response DHMH impermissibly forced her to attend counseling with Dr. Gehl in March 2006 under threat of employment termination.

As an initial matter, DHMH concedes it is subject to the ADA and that Ford was qualified to perform her job duties.  It denies, however, that Ford was disabled or that she suffered adverse employment action because of her disability.

Ford fails to provide any evidence at all and does not even argue that she was substantially limited in any life activities.  Therefore no reasonable jury could find that her supervisors regarded her as suffering from a disability.  She also fails to provide sufficient evidence that she suffered adverse employment action because of her perceived disability.  The Second Circuit has specifically held that requiring an employee to undergo an evaluation does not evidence discrimination.  <u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 647 (2d Cir. 1998) (concluding that the fact that the police department required only the plaintiff officers to undergo a physical exam did not support an inference that plaintiffs were regarded as disabled); <u>see also</u> <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d 804, 808, 810 (6th Cir. 1999) (fact that employer required employee who engaged in "disruptive and abusive

outbursts" to submit to mental and physical exams "is not enough
to suggest that the employee is regarded as mentally disabled
. . . . [A] defendant employer's perception that health problems
are adversely affecting an employee's job performance is not
tantamount to regarding that employee as disabled."); Cody v.
CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir.
1998) ("An employer's request for a mental evaluation is not
inappropriate if it is not obvious that an employee suffers from
a disability. A request for an evaluation is not equivalent to
treatment of the employee as though she were substantially
impaired. Employers need to be able to use reasonable means to
ascertain the cause of troubling behavior without exposing
themselves to ADA claims." (citations omitted)). Furthermore
because DHMH has proffered substantial evidence of a legitimate
nondiscriminatory reason for her firing, namely that Ford
physically assaulted other employees, Ford's ADA claim must fail.

## CONCLUSION

Defendant's motion for summary judgment is granted in
all respects. The complaint is dismissed with prejudice and
without costs. The Clerk of the Court shall enter judgment
accordingly.

SO ORDERED.

Dated:    New York, New York
          April 23, 2008

DENNY CHIN
United States District Judge

- 38 -